1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JOHNNIE RAY PERAZA,

11              Petitioner,                    No. CIV S-06-0363 JAM DAD P

12        vs.

13   ROSANNE CAMPBELL,                         ORDER AND

14              Respondent.                    FINDINGS AND RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered

18   against him on March 1, 2000, in the San Joaquin Superior Court on charges of murder,

19   attempted murder, burglary, and shooting at an inhabited residence, with enhancements for use of

20   a firearm and commission of crimes in furtherance of a street gang.  He seeks relief on the

21   grounds that: (1) he is factually innocent of the crimes for which he was convicted; (2) his trial

22   counsel rendered ineffective assistance; (3) the prosecutor committed misconduct; (4) the

23   evidence was insufficient to support the gang enhancement allegation; (5) his right to due process

24   was violated by jury instruction error; and (6) his constitutional rights were violated when he was

25   shackled during trial.  Upon careful consideration of the record and the applicable law, the

26   undersigned will recommend that petitioner's application for habeas corpus relief be denied.

PROCEDURAL AND FACTUAL BACKGROUND[1]

Defendants Elisio Valdez and Johnnie Ray Peraza were convicted of various crimes, including the murders of Andrea Mestas and her fetus, the premeditated attempted murder of Ronny Giminez, and the false imprisonment and aggravated assault of Nancy Davis. The crimes were committed at separate times and in separate places. The prosecutor theorized that defendants went to Mestas's apartment intending to kill her boyfriend on orders from the Nuestra Familia, a prison gang. The prosecutor also presented evidence that the Nuestra Familia considered Mestas to be a "rat" and a "snitch." As to the motive for the Giminez shootings and the crimes against Davis, who was defendant Peraza's girlfriend, evidence indicated that Peraza was upset because Davis had been seeing Giminez, the father of three of her children.

Defendant Valdez was sentenced to multiple life sentences, plus a determinate term of 11 years and 8 months in prison. Defendant Peraza received multiple life sentences, plus a determinate term of 14 years in prison. On appeal, they raise numerous claims of error.

\* \* \*

Defendants' convictions are based upon events that occurred on July 13, 1998. We summarize the facts in the light most favorable to the judgment. (People v. Mayfield (1997) 14 Cal.4th 668, 767, 60 Cal.Rptr.2d 1, 928 P.2d 485.)

At about 4:15 a.m., defendant Valdez knocked at the door to Ronny Giminez's apartment. When Giminez opened the door, Valdez asked if he was "Ronny" and whether apartment 3 was for rent. As Giminez looked toward apartment 3, Valdez fired a gun. The bullet missed Giminez but penetrated the ceiling of the apartment. Giminez struggled with Valdez and managed to get the door shut. After police responded to the scene, Giminez identified Valdez as the assailant. However, he recanted the identification at trial.

Around 5:00 a.m., Andrea Mestas's daughter, Angelina, was in the living room of their home when Mestas opened the door and spoke to a man who asked if he could use the telephone. According to Angelina, Mestas said the phone was not working and began yelling, "No, Elisio, no." Angelina then saw defendant Valdez shoot Mestas twice at close range and run away. A car similar to one owned by defendant Peraza was observed leaving the scene. When officers responded to Angelina's 9-1-1 call, they found

---

[1] The following summary is drawn from the February 4, 2005 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), lodged by respondent on September 18, 2008 and entitled "Opinion After Remand," at pgs 2-5.

Mestas dead, lying face down in her blood. An autopsy revealed that defendant Valdez's gun had been within inches of Mestas's chest when the fatal bullet that perforated her heart was fired. Mestas was pregnant with a 16- to 17-week-old fetus, which perished as the result of Mestas's death.

Shortly before 5:30 a.m., two men in a car similar to one owned by defendant Peraza twice drove by Giminez's apartment. Multiple gunshots fired out of the passenger side of the car riddled the apartment with bullet holes.

At about 7:00 a.m., defendant Peraza came to the apartment of his girlfriend, Nancy Davis, and asked to speak with her. When Davis told Peraza that he was not welcome and refused to let him in, Peraza pulled a firearm from his pants, pointed it at her, and said, "Don't fuck with me." Davis fled to her bedroom, closed the door, and telephoned 9-1-1 to report that Peraza was there with a gun. Peraza forced his way into the bedroom and pulled back the slide of his gun to demonstrate that it was loaded. Outside the bedroom, Davis's sister, Julia Raines, heard the sound of the gun being manipulated and Davis crying. Raines left to get help. Police arrived while defendant Peraza was inside the apartment, holding Davis and her children hostage. Peraza fled by jumping over the backyard fence. He was captured in a building on an adjacent property.

Defendant Peraza's gun was found hidden inside Davis's apartment. A ballistics test revealed that bullets recovered from the scene of the Giminez shootings and the Mestas murder had been fired from Peraza's gun. In Peraza's car, officers discovered an expended shell casing that matched casings found at Giminez's residence.

Davis informed the police that, while defendant Peraza was in her apartment, he told her that he had killed Giminez. Defendant Peraza later told Valdez's brother-in-law, Robert Juarez, that he had murdered Mestas.

The prosecutor theorized that defendants went to Mestas's apartment intending to kill her boyfriend, David Ortega, on orders from the Nuestra Familia, a prison gang. The prosecutor also presented evidence that the Nuestra Familia considered Mestas to be a "rat" and a "snitch."

As to the motive for the Giminez shootings and the crimes against defendant Peraza's girlfriend, Nancy Davis, evidence indicated that Peraza was upset because Davis had been seeing Giminez, the father of three of her children.

/////

/////

1            On appeal, petitioner and his co-defendant Valdez claimed, among other things,

2   that in order to be convicted of the implied malice murder of Mestas's fetus, they had to have

3   reason to believe that Mestas was pregnant.  (Opinion at 13-14.)  In an opinion filed on June 25,

4   2003, the California Court of Appeal agreed.  (Opinion at 14-15.)  The appellate court reversed

5   the convictions of petitioner and Valdez for the murder of Mestas's fetus and also reversed the

6   multiple murder special circumstance findings, because "the court's instructions on implied

7   malice, coupled with the prosecutor's erroneous statements of the law during argument, misled

8   the jurors into thinking they could convict defendants on both murders while finding malice

9   aforethought only as to Mestas's death." (Id. at 15.)  Subsequently, the California Supreme Court

10   granted the prosecution's petition for review and deferred consideration of the petition pending

11   its decision in People v. Taylor, 32 Cal. 4th 863 (2004) (hereafter Taylor).  (Id.)  Later, in Taylor,

12   the California Supreme Court held that "a person who murders a pregnant woman may be found

13   guilty of implied malice murder of the fetus even if the killer does not know the woman is

14   pregnant."  (Opinion at 15) (citing Taylor, 32 Cal. 4th at 868-70.)

15            After Taylor was decided, petitioner's case was transferred to the California Court

16   of Appeal with directions to vacate its decision and to reconsider the matter in light of the Taylor

17   decision.  (Opinion at 15.)  On remand, the California Court of Appeal rejected all of the

18   challenges raised by petitioner and his co-defendant Valdez, including their challenges to their

19   convictions for the murder of Mestas's fetus, modified the judgements to correct several

20   sentencing errors and otherwise affirmed the convictions.  On March 8, 2005, petitioner filed a

21   petition for review in the California Supreme Court.  (Lodged Document entitled "California

22   Supreme Court Docket Reflecting Order Denying Review.")  On May 11, 2005, that petition for

23   review was denied.[2]  (Id.)

24

25          [2] Justice Kennard was of the opinion that the petition for review should be granted.

26   (Lodged Document entitled "California Supreme Court Docket Reflecting Order Denying Review.")

On September 2, 2006, petitioner filed a petition for a writ of habeas corpus in the California Supreme Court.  (Copy of State Court Habeas Petition, filed August 5, 2009 (Doc. No. 45).)  Although petitioner asserted only a claim of actual innocence on the state habeas form, he attached points and authorities that contained additional claims of prosecutorial misconduct and ineffective assistance of trial counsel.  (Id. at 3 of 46, 28-40 of 46.)  Petitioner also requested an evidentiary hearing.  (Id. at consecutive page 1.)  Respondent represents, and petitioner does not contest, that petitioner's habeas petition was summarily denied by the California Supreme Court. (Answer at 3.)[3]

ANALYSIS

I.  Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall
> not be granted with respect to any claim that was adjudicated on

---

[3]  This court has not been provided with a copy of the California Supreme Court's decision on petitioner's habeas petition.

5

the merits in State court proceedings unless the adjudication of the claim -

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001). If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008). See also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

1   II.  Petitioner's Claims

2         A.  Actual Innocence

3              Petitioner's first claim is that he is actually innocent of the crimes for which he

4   was convicted.  He includes as an exhibit to his petition a declaration signed under penalty of

5   perjury by his co-defendant, Elisio Valdez, in which Valdez states that petitioner was not

6   involved in any of the criminal activity that took place "during the entire twenty-four hour period

7   of July 13, 1998."  (Pet., Ex. A at 1.)  Valdez declares that petitioner

8            was not involved in any of the acts or actions nor was he culpable
             for any of the results occurring on July 13, 1998.  Johnnie Ray
9            Peraza did not drive me, did not accompany me, did not ask or
             advise me, did not aid or abet me, in any act or action during July
10           13, 1998.

11   (Id. at 4.)  Valdez further states that he was prevented from declaring petitioner's innocence

12   during their joint trial because his trial counsel advised him not to testify.  (Id. at 1.)

13              In Herrera v. Collins, 506 U.S. 390 (1993), a majority of the Supreme Court

14   assumed, without deciding, that a freestanding claim of actual innocence is cognizable under

15   federal law.  In this regard, the court observed that "in a capital case a truly persuasive

16   demonstration of 'actual innocence' made after trial would render the execution of a defendant

17   unconstitutional, and warrant federal habeas relief if there were no state avenue open to process

18   such a claim."  Id. at 417.  A different majority of the Supreme Court explicitly held that a

19   freestanding claim of actual innocence is cognizable in a federal habeas proceeding.  Compare

20   506 U.S. at 417 with 506 U.S. at 419 and 430-37.  See also Jackson v. Calderon, 211 F.3d 1148,

21   1165 (9th Cir. 2000) (noting that a majority of the Justices in Herrera would have supported a

22   free-standing claim of actual innocence).  Although the Supreme Court did not specify the

23   standard applicable to this type of "innocence" claim, it noted that the threshold would be

24   "extraordinarily high" and that the showing would have to be "truly persuasive."  Herrera, 506

25   U.S. at 417.  More recently, the United States Supreme Court declined to resolve whether federal

26   courts may entertain independent claims of actual innocence but concluded that the petitioner's

7

1  showing of innocence in the case before it fell short of the threshold suggested by the Court in

2  Herrera.  House v. Bell, 547 U.S. 518, 554-55 (2006).  Finally, the Supreme Court has recently

3  once again assumed, without deciding, that a federal constitutional right to be released upon

4  proof of "actual innocence" exists.  District Attorney's Office for Third Judicial Dist. v. Osborne,

5  ___U.S.___, 129 S. Ct. 2308 (2009).  In doing so, the Supreme Court noted that it is an "open

6  question" whether a freestanding claim of actual innocence exists and that the court has

7  "struggled with it over the years, in some cases assuming, *arguendo*, that it exists while also

8  noting the difficult questions such a right would pose and the high standard any claimant would

9  have to meet."  129 S. Ct.  at 2321.

10         The Ninth Circuit Court of Appeals has likewise assumed that freestanding

11  innocence claims are cognizable in both capital and non-capital cases and has also articulated a

12  minimum standard of proof in order to prevail on such a claim.  Carriger v. Stewart, 132 F.3d

13  463, 476 (9th Cir. 1997) (en banc).  Under that standard "[a] habeas petitioner asserting a

14  freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must

15  affirmatively prove that he is probably innocent."  132 F.3d at 476-77.  See also Jackson, 211

16  F.3d at 1165.  The petitioner's burden in such a case is "extraordinarily high" and requires a

17  showing that is "truly persuasive."  Carriger, 132 F.3d at 476 (quoting Herrera, 506 U.S. at 417).

18         Assuming arguendo that a freestanding claim of innocence may be maintained in

19  this non-capital case, petitioner has failed to make the showing required to entitle him to relief.

20  The court notes, first, that Valdez's declaration has no bearing on petitioner's convictions

21  resulting from his assault on Davis, even though it purports to absolve petitioner of all criminal

22  activity that took place on July 13, 1998.  Moreover, post-trial exculpatory declarations from co-

23  defendants, such as that of Valdez, are inherently suspect.  As the Ninth Circuit has observed in

24  considering similar evidence:

25              [A]ppellant argues that the co-defendants were prevented from
               testifying by their attorneys.  This mere allegation is insufficient to
26              establish that the co-defendants' testimony is newly discovered.

8

> There is no evidence that they were forced to refrain from testifying. [fn. omitted]  Furthermore, at the time it was probably prudent for them to decline to testify.  [They] had each pled guilty on July 17, but had not been sentenced yet. Testifying now, however, is safe for the co-defendants, as they have already been sentenced.  It would encourage perjury to allow a new trial once co-defendants have determined that testifying is no longer harmful to themselves.  They may say whatever they think might help their co-defendant, even to the point of pinning all the guilt on themselves, knowing they are safe from retrial.  Such testimony would be untrustworthy and should not be encouraged.  We find that the judge did not abuse his discretion in refusing to grant a new trial on the basis of newly discovered evidence.

United States v. Reyes-Alvarado, 963 F.2d 1184, 1188 (9th Cir. 1992).  See also Awon v. United States, 308 F.3d 133, 141 (1st Cir. 2002) ("By the time of his affidavit St. Louis had nothing to lose by exonerating Awon. He had already been convicted and sentenced. He was in a position to say whatever he thought might help Awon [.]"); United States v. Montilla-Rivera, 171 F.3d 37, 42 (1st Cir. 1999) (finding that by the time of their post-sentencing affidavits co-defendants had nothing to lose by saying "whatever they [thought] might help their co-defendant, even to the point of pinning all the guilt on themselves, knowing they [were] safe" from any increased punishment for the transaction); United States v. Freeman, 77 F.3d 812, 817 (5th Cir. 1996) (recognizing that a convicted, sentenced co-defendant has little to lose (and perhaps something to gain) by such testimony); United States v. Simmons, 714 F.2d 29, 31 (5th Cir. 1983) (post-sentencing exculpatory testimony of co-conspirators found to be "inherently suspect").

Therefore, Valdez's declaration does not constitute a "truly persuasive demonstration" that petitioner is innocent of the other charges against him.  Herrera, 506 U.S. at 417.  Accordingly, petitioner is not entitled to relief on his claim of actual innocence.

B.  Ineffective Assistance of Trial Counsel

Petitioner next claims his trial counsel rendered ineffective assistance by failing to investigate and present certain evidence at petitioner's trial.  (Pet. at 4, 8-9.)  After setting forth the applicable legal principles, the court will address petitioner's specific claims in turn below.

/////

1        1. <u>Legal Standards</u>

2        The Sixth Amendment guarantees the effective assistance of counsel.  The United

3   States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

4   <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

5   counsel, a petitioner must first show that, considering all the circumstances, counsel's

6   performance fell below an objective standard of reasonableness.  466 U.S. at 687-88.  After a

7   petitioner identifies the acts or omissions that are alleged not to have been the result of

8   reasonable professional judgment, the court must determine whether, in light of all the

9   circumstances, the identified acts or omissions were outside the wide range of professionally

10  competent assistance.  <u>Id.</u> at 690; <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003).  Second, a

11  petitioner must establish that he was prejudiced by counsel's deficient performance.  <u>Strickland</u>,

12  466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for

13  counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at

14  694.  A reasonable probability is "a probability sufficient to undermine confidence in the

15  outcome."  <u>Id.</u>  <u>See also</u> <u>Williams</u>, 529 U.S. at 391-92; <u>Laboa v. Calderon</u>, 224 F.3d 972, 981

16  (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was

17  deficient before examining the prejudice suffered by the defendant as a result of the alleged

18  deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of

19  sufficient prejudice . . . that course should be followed."  <u>Pizzuto v. Arave</u>, 280 F.3d 949, 955

20  (9th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at 697).

21        Defense counsel has a "duty to make reasonable investigations or to make a

22  reasonable decision that makes particular investigations unnecessary."  <u>Strickland</u>, 466 U.S. at

23  691.  "This includes a duty to . . . investigate and introduce into evidence records that

24  demonstrate factual innocence, or that raise sufficient doubt on that question to undermine

25  confidence in the verdict."  <u>Bragg v. Galaza</u>, 242 F.3d 1082, 1088 (9th Cir. 2001) (citing <u>Hart v.</u>

26  <u>Gomez</u>, 174 F.3d 1067, 1070 (9th Cir. 1999)).  In this regard, it has been recognized that "the

1  adversarial process will not function normally unless the defense team has done a proper

2  investigation." Siripongs v. Calderon (Siripongs II), 133 F.3d 732, 734 (9th Cir. 1998) (citing

3  Kimmelman v. Morrison, 477 U.S. 365, 384 (1986)).  Therefore, counsel must, "at a minimum,

4  conduct a reasonable investigation enabling him to make informed decisions about how best to

5  represent his client." Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting

6  Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citation and quotations omitted).

7  On the other hand, where an attorney has consciously decided not to conduct further investigation

8  because of reasonable tactical evaluations, his or her performance is not constitutionally

9  deficient.  See Rompilla v. Beard, 545 U.S. 374, 383 (2005) ("the duty to investigate does not

10  force defense lawyers to scour the globe on the off-chance something will turn up; reasonably

11  diligent counsel may draw a line when they have good reason to think further investigation would

12  be a waste"); Siripongs II, 133 F.3d at 734; Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.

13  1998); Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).  "A decision not to investigate thus

14  'must be directly assessed for reasonableness in all the circumstances.'" Wiggins, 539 U.S. at

15  533 (quoting Strickland, 466 U.S. at 691).  See also Kimmelman, 477 U.S. at 385 (ineffective

16  assistance where counsel "neither investigated, nor made a reasonable decision not to

17  investigate"); Babbitt, 151 F.3d at 1173-74.  A reviewing court must "examine the

18  reasonableness of counsel's conduct 'as of the time of counsel's conduct.'" United States v.

19  Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting Strickland, 466 U.S. at 690).

20  Furthermore, "'ineffective assistance claims based on a duty to investigate must be considered in

21  light of the strength of the government's case.'" Bragg, 242 F.3d at 1088 (quoting Eggleston v.

22  United States, 798 F.2d 374, 376 (9th Cir. 1986)).

23          In assessing an ineffective assistance of counsel claim "[t]here is a strong

24  presumption that counsel's performance falls within the 'wide range of professional assistance.'"

25  Kimmelman, 477 U.S. at 381 (quoting Strickland, 466 U.S. at 689).  There is in addition a strong

26  /////

presumption that counsel "exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

### 2. Background

Robert Juarez (Juarez) testified for the prosecution at petitioner's trial. (Reporter's Transcript on Appeal (RT) at 924-1184.) Juarez was formerly a member of the Nuestra Familia prison gang and he was the brother-in-law of petitioner's co-defendant, Elisio Valdez. (Id. at 926-28.) Among other things, Juarez testified that after he was released from the California State Prison at Pelican Bay (Pelican Bay), he went to petitioner's house and, while there, he intercepted and confiscated a letter to petitioner from someone at Pelican Bay telling petitioner to "dust," or kill Juarez. (Id. at 1000-01, 1006.) Juarez further testified that when he and petitioner were incarcerated at Deuel Vocational Institution (DVI) and were in cages after taking a shower, he asked petitioner about the shooting of Mestas and petitioner responded that he "dusted the bitch." (Id. at 1010-11, 1027.) Petitioner also made a gesture indicating that a gun was used to kill Mestas. (Id. at 1036.) Juarez also testified that at one point when petitioner was housed "a few doors" down from him at DVI, he and petitioner had a further conversation about the Mestas murder. (Id. at 1028-29.) During that conversation, petitioner told Juarez that he "dusted the bitch" because "she was a rat" and explained some of the particulars surrounding the Mestas killing. (Id. at 1028-29, 1036.) Juarez testified that he had heard elsewhere that Mestas was a "rat." (Id. at 1029.) Specifically, Juarez had heard that Mestas testified against someone in a murder trial. (Id. at 1031.)

After the verdicts were rendered in this case, petitioner waived his right to counsel and proceeded pro se. (Supplemental Reporter's Transcript on Appeal (SRT) at 74-83.) On August 1, 2000, petitioner filed and argued a motion for new trial in the trial court. (Id. at 131-54; CT at 911-17.) Petitioner argued that his counsel did not provide him with adequate representation at trial. Specifically, he complained that trial counsel failed to obtain records establishing that petitioner "never came in contact" with Juarez at DVI, and that he was not

housed in a cell next to Juarez.  (SRT at 132-33.)[4]  Petitioner also argued that his trial counsel:

(1) improperly failed to exclude "a lot of hearsay testimony by Robert Juarez;" (2) violated

petitioner's right to due process by failing to cooperate with petitioner's suggestions regarding

the conduct of the trial; (3) failed to demonstrate that there was insufficient evidence linking

petitioner to the charged crimes; (4) failed to investigate a shoe-print found at the scene of the

Mestas shooting that did not fit petitioner's shoe-print; (5) failed to subpoena the mail sergeant at

Pelican Bay to refute Juarez's testimony that a letter was mailed from Pelican Bay to petitioner;

(6) failed to move to sever petitioner's trial from that of his co-defendant Valdez; and (7) failed

to challenge the testimony of a prosecution witness who stated he saw a car matching petitioner's

car at the scene of one of the crimes.  (Id. at 133-39.)  Petitioner also argued that his trial counsel

abandoned him, that he was unable to communicate with his counsel, and that his trial counsel

"threatened" him by falsely telling him that the shoe-print placed him at the scene of the Mestas

shooting.  (Id. at 138, 143.)   Petitioner noted several times that he was not identified by any

eyewitness as being present at the shooting of Mestas or the attempted shooting of Giminez, and

questioned why he was nevertheless found guilty of those crimes.  (Id. at 133-39, 145-47.)

After hearing petitioner's argument on the motion for new trial, the trial court

granted an evidentiary hearing and appointed an investigator to assist petitioner.  (Id. at 165, 171-

76.)  Several witnesses testified at that evidentiary hearing, as explained below.

Correctional Sergeant Mark Piland testified as follows.  At Pelican Bay, some, but

not all, of the outgoing mail, including mail involving known prison gangs, was reviewed and

read.  (RT at 2415-16, 2421.)  There are no inmates whose mail is always read.  (Id. at 2423-24.)

A piece of mail which contained a directive to "kill someone" would be "stopped," but only if it

was read by the mail room staff and was understood as a directive to kill.  (Id. at 2414, 2418,

/////

---

[4]  Petitioner explained that when he was housed in DVI, he "was in cell 4, he (Juarez) was in cell 27.")  (Id. at 133.)

1    2422-23, 2429.)  Sergeant Piland was not familiar with petitioner, but he had heard of Robert

2    Juarez.  (Id. at 2425, 2430.)

3              Sergeant Den Dulk testified that at DVI, several inmates could be in holding cells

4    at the same time.  (Id. at 2459.)  Correctional staff document inmates' movements in the

5    administrative segregation unit, including when they use the showers.  (Id. at 2480.)  However,

6    time spent in holding cells is not necessarily documented.  (Id. at 2481.)  If an inmate was waving

7    his hands while standing in a holding cell, another inmate could see it.  (Id. at 2462.)  Sergeant

8    Den Dulk also testified that some inmates "yell important stuff" to inmates in other cells, and

9    some don't.  (Id. at 2468-69.)  He testified that inmates "blurt stuff out all the time."  (Id. at

10   2473.)

11             Monivie Peraza, petitioner's sister, testified that petitioner's trial counsel told her

12   petitioner's case was "open and shut."  (Id. at 2498.)  When she asked counsel why petitioner's

13   trial wasn't severed from that of Valdez, he "just shook his head like, 'I don't know'" and said it

14   was "too late" for a severance.  (Id.)  She testified that petitioner's complained to her that his trial

15   counsel failed to file motions that petitioner had suggested or written, threatened petitioner "with

16   evidence," and didn't like petitioner.  (Id. at 2499.)

17             Petitioner's trial counsel also testified at the hearing.  He stated that he didn't

18   personally cause any physical evidence to be tested because he received test results from co-

19   counsel or from the prosecutor and there was no physical evidence linking petitioner to the

20   crimes.  (Id. at 2503-07, 2547.)  He did not compare petitioner's shoe-print size to the size of the

21   shoe-print found at the scene of the Mestas shooting because the prosecutor's theory of the case

22   was that petitioner was the driver of the getaway car, not the shooter.  (Id. at 2515.)  Counsel

23   denied telling petitioner that the reason he didn't have the shoe-print tested is that he believed the

24   prints belonged to petitioner and did not want to create evidence that could be used by the

25   prosecutor to prove petitioner's guilt.  (Id. at 2518.)  Counsel also denied that petitioner asked

26   him to test the shoe-prints.  (Id. at 2519-20.)  Counsel denied that he ever threatened or belittled

14

petitioner in order to prevent him from making outbursts in the courtroom or to dissuade him from testifying.  (Id. at 2527-29.)   Counsel acknowledged that petitioner wanted to sever his trial from Valdez's trial.  (Id. at 2531-32.)  He testified that it was difficult working with petitioner, that he was nervous around petitioner on several occasions, and that he swore at petitioner in the courtroom several times in order to induce petitioner to improve his behavior.  (Id. at 2532-37.)  However, counsel did not dislike petitioner and their difficult relationship did not affect counsel's motivation.  (Id. at 2532.)  Counsel did not refuse to ask questions petitioner wanted him to ask.  Rather, he incorporated petitioner's suggestions into his own questions, covered the material in another way, or didn't ask the question because he didn't think it was a good idea. (Id. at 2537.)  Counsel did not subpoena a correctional sergeant from Pelican Bay to testify at trial to the mail procedures at the prison because he did not think Juarez was a credible witness and he "didn't think the jury would believe him."  (Id. at 2540.)  Counsel also testified he did not believe he could establish that all letters leaving Pelican Bay were read by correctional staff.  (Id. at 2541.)

Counsel testified he did not file a "severance motion" because he believed it would be advantageous for petitioner to be tried with Valdez so that "the jury would have somebody else to hang their – a conviction on and be able to exonerate [petitioner]," and because there was no evidence "that was going to be admissible against [Valdez] but not admissible against [petitioner]."  (Id. at 2542-43.)  Counsel "didn't think it was to [petitioner's] advantage to be tried alone in the case."  (Id. at 2543.)  Counsel also explained that while Juarez was potentially a harmful witness at trial, he was not believable.  (Id.)

On cross-examination, petitioner's trial counsel explained that he did not find the shoe-print evidence to be "significant;" that he had the weapon and the casings tested but the results were not inconsistent with the prosecution' evidence; and that he subpoenaed evidence concerning the housing records of petitioner and Juarez when they were at DVI together but decided not to present that evidence because it showed that for ten days petitioner and Juarez

1  were housed one cell apart from one another.  (Id. at 2547-48.)  Petitioner's trial counsel testified

2  that he believed that "presenting evidence of housing records wouldn't help impeach Mr. Juarez,

3  or help discredit him."  (Id. at 2550.)

4          Petitioner's mother also testified as a witness at the hearing on the motion for new

5  trial.  (Id. at 2552.)  She stated that petitioner's trial counsel told her it would not be "good for

6  [petitioner] to sever his trial from Valdez's trial," and that counsel did not believe petitioner

7  should testify at trial because he would "hurt [his] own case."  (Id.)  Petitioner told his mother

8  that his trial counsel told him he thought the shoe-print found at the scene of the Mestas murder

9  belonged to petitioner.  (Id. at 2556.)  He also told her that his trial counsel did not communicate

10  with him sufficiently.  (Id. at 2556-57.)

11          Petitioner testified at the hearing as well.  He stated that his trial counsel

12  "threatened" him that the shoe-prints found at the Mestas house belonged to petitioner.  When

13  petitioner requested that counsel get the print tested counsel refused, telling petitioner that the

14  prosecutor would then be able to obtain the test results.  (Id. at 2562-63.)  Petitioner stated that

15  his trial counsel rarely took his advice and that "it was his decision, not mine, on everything that

16  took place in the courtroom, if I wanted something to take place, if he didn't think it was right, it

17  didn't take place."  (Id. at 2563, 2565.)  Petitioner also repeated that he wanted counsel to file a

18  motion for severance and to subpoena records to impeach Juarez's testimony but that counsel

19  refused to do so.  (Id. at 2566-67.)  Petitioner stated that his trial counsel told him he couldn't

20  "get on the stand."  (Id. at 2568.)  He also testified that he could not get in touch with his trial

21  counsel and that his family members were forced to act as intermediaries.  (Id. at 2570.)

22          After hearing this testimony, the trial court denied petitioner's motion for new

23  trial, ruling as follows:

24          I'd like to take a moment and address the motion of Mr. Peraza
          regarding motion for new trial based on incompetence of counsel,
25          so called Pope error referred to, 23 Cal.3d 412, People versus
          Pope.

26  /////

The issue, without – I'm not going to spend a great deal of time with this, but I did observe during the course of the trial Mr. Hirschfield speaking on numerous occasions with Mr. Peraza during the course of the trial, Mr. Peraza seeking his attention. And Mr. Hirschfield did, on occasion, ask the Court – as it would be reflected in the minutes – for an opportunity to talk to Mr. Peraza in chambers because of – either from his behavior or a look on his face it appeared to the Court that Mr. Peraza was upset. And so I did give him that opportunity, and usually Mr. Peraza settled down after those breaks.

The relevance of this is that the tactical choice on how to handle the witness Juarez relied in part I think on the appearance that he was an incredible – that is, not believable – witness. And, frankly, the Court found him not believable. He started out pretty good; but the longer he was on the stand, the more he gave the appearance of constructing a story. And one might – when he got to the point of admitting that he had just lied to the jury, I thought his credibility was gone.

So, number one, it was a – a conscientious, diligent advocate who made a tactical decision not to pursue challenging the credibility of Juarez further.

Also, from the testimony I heard, even had those witnesses from the institution – those or other witnesses been called, they couldn't say for a hundred percent sure that the things Juarez said were not true; may be unlikely, but no hundred percent sure that they are false. And, consequently, even if Mr. Hirschfield should have – which I don't think he had to – but even if he should have sought to attack the credibility of Juarez with outside evidence, there wasn't any such evidence to be presented. That would do more – or, you know, prove that he could not be telling the truth.

Another point was whether – on the issue of whether to testify or not. And the Court finds that Mr. Peraza did indeed have a choice and exercised that choice regarding his own testimony. That his attorney was giving him advice, honest advice as he saw it, as he was required to do.

Your lawyer had to tell you how he saw things. To do anything else would have been a mis – you know, a – not doing his job.

All right. And, frankly, if – you know, there's – may be some wisdom in trying to become less prominent on your behalf since, you know, trying to sit there and let the jury think about Mr. Valdez, who is alleged and found to have done most of the crimes directly – Mr. Hirschfield didn't say that, but I think that's a fair inference of what he was trying to suggest to you; you know, kind of stand back and let the jury look at Mr. Valdez.

/////

1
2

> But, in any event, while he gave you strong advice, I think as he described it, and as I observed it, he needed to tell you in strong terms.

3
4
5
6
7

> You're an intelligent person, Mr. Peraza, but understanding something requires more than intelligence.  You have to be willing to understand it.  And I think you have difficulty in that aspect, because you don't like the outcome of understanding aiding and abetting.  It means that you were responsible and can be responsible for crimes you didn't plan or outcomes you didn't want.  I don't mean to say you didn't plan them or didn't want them, I'm trying to explain the law of aiding and abetting.  So you had some difficulty with understanding why Mr. Hirschfield was giving you the advice that he did.

8
9
10

> In any event, I'm more than satisfied that Mr. Hirschfield was a reasonably competent attorney; more than satisfied that he was acting in a conscientious and – and acting as a conscientious and diligent advocate.  He was doing his best, of that I am sure.

11

> All right.  So the motion for new trial by Mr. Peraza, based on the incompetence of counsel, or Pope error, is also denied.

12

13    (RT at 2591-93.)

14                    3.  Petitioner's Arguments

15          Petitioner claims that his trial counsel rendered ineffective assistance in several

16    areas.  First, he faults counsel for failing "to investigate mail procedures at Pelican Bay State

17    Prison (PBSP) in order to discredit the testimony of prosecution witness Robert Juarez who

18    testified that he obtained a letter addressed to petitioner from a gang member."  (Pet. at 4, 8.)

19    Petitioner asserts, "on information and belief," that "mail to and from gang members at PBSP are

20    carefully monitored and confiscated by the Institutional Gang Investigators (IGI)."  (Id. at 8.)  He

21    explains that if a gang member had written to him from Pelican Bay, prison officials would have

22    found out about it and notified petitioner's parole officer.  (Traverse at 8.)  In his traverse,

23    petitioner suggests that his trial counsel should also have investigated "the alleged gang member

24    that Juarez stated wrote to petitioner."  (Id.)

25          Second, petitioner complains that his trial counsel failed to "investigate cell

26    records and plant design at Deuel Vocational Institution" in order to impeach Juarez's testimony

                                            18

that petitioner was close enough to Juarez at DVI to "admit[] killing Andrea Mestas by hollering

from his cell, some twenty cells away from Juarez's cell."  (Pet. at 8.)  Third, petitioner claims

that his trial counsel rendered ineffective assistance by failing to investigate "paperwork" to

discredit Juarez's testimony that Mestas was killed because she was perceived as a "rat" by the

Nuestra Familia gang.  (Id.)  Petitioner faults counsel for failing to investigate "the background of

Mestas to determine if a) why the [Nuestra Familia] perceived Mestas to be a rat, or b) if Mestas

had ever assisted law enforcement in any matter in the past."  (Traverse at 9.)  Petitioner

represents that he was unaware Mestas was "perceived as a rat."  (Id. at 9-10.)[5]

---

[5]  Juarez's testimony underlying petitioner's third argument was as follows:

Q.  Well, what did Mr. Peraza tell you?

A.  He said – um, he dusted the bitch 'cause she was a rat.  And they wanted Casper, too.

I asked him –

Q.  Because "she" was a rat?

A.  Yes.

Q.  And let's just stop right there for a second.

Now, before you were in prison and you were out in the street, had you heard anything about Andrea Mestas being a rat?  You yourself.  Had you heard it?

A.  Yes.

Q.  Did you ever talk to Casper about that?

A.  Yeah.

Q.  What's she supposedly ratting on?

After a lengthy conversation about whether the foregoing testimony constituted hearsay, the questioning of Juarez continued, as follows:

Q.  Again, what had you heard about Andrea Mestas being a rat?

A.  Um, I heard she testified in a trial, that's all – a murder trial.

1   Petitioner argues that counsel's failure to investigate these issues was "particularly

2   prejudicial" because the evidence against petitioner was "purely circumstantial." (Pet. at 8.)  He

3   notes that "the only prosecution witness to testify about petitioner's actual involvement in the

4   crimes was – Robert Juarez." (Id.)  Therefore, petitioner argues, it was critical to impeach

5   Juarez.  Petitioner states that if counsel had conducted further investigation, he would have

6   discovered that "no letter was obtained by Juarez; inmates do not admit killings by yelling down

7   a tier for all inmates to hear; and there was no 'paperwork' showing Mestas to be a 'rat.'" (Id.)

8          4. Analysis

9          After a review of the relevant record, this court concludes that petitioner has failed

10  to demonstrate deficient performance or prejudice with respect to his claim of ineffective

11  assistance of trial counsel.  As explained above, the trial court held an exhaustive hearing on

12  petitioner's motion for new trial and allowed petitioner to call witnesses and engage in extensive

13  argument.  The trial judge concluded that petitioner's trial counsel acted reasonably in

14  conducting petitioner's defense.  The trial judge specifically found that counsel's decision not to

15  "pursue challenging the credibility of Juarez" was reasonable because Juarez's trial testimony

16  had already been shown in several respects to be untruthful and unbelievable.  The trial judge

17  also concluded, after hearing the testimony of Officers Piland and Den Dulk, that further

18  investigation regarding the mail records at Pelican Bay or the housing records at DVI would not

19  have resulted in a different outcome at petitioner's trial.  After a review of the record, this court

20  agrees with the trial court's conclusions.  Even petitioner concedes that Juarez "admitted he

21  lacked 'truthfulness' and told police detectives answers that he believed would be satisfying to

22  them." (Traverse at 7.)   Petitioner also apparently conceded at the hearing on his motion for new

23

24          Q. In a murder trial?

25          A. Yeah.  Tried to send some people away.  That's what I hear.

26  (RT at 1029-31.)

trial that he was housed in fairly close proximity to Juarez while they were inmates at DVI, informing the trial court that he was "in cell 4, [Juarez] was in cell 27." (SRT at 133.)[6]   Under these circumstances, trial counsel's decision not to pursue further investigation into these areas was reasonable.

Moreover, petitioner has failed to demonstrate prejudice with respect to his claim that his trial counsel rendered ineffective assistance by failing to ascertain whether Mestas was viewed as a "rat" by other members of the Nuestra Familia.  The court notes, first, that whether Mestas was actually viewed as a "rat" by others was irrelevant to the issues presented at petitioner's trial.[7]  Accordingly, trial counsel did not render ineffective assistance in failing to pursue this avenue of investigation.  In any event, petitioner's speculation that Mestas was not viewed as a "rat," and that his trial counsel could have ascertained this fact through investigation, is insufficient to establish prejudice.  See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ("'[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief'") (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)).

For the foregoing reasons, petitioner is not entitled to relief on his claim of ineffective assistance of trial counsel.

C.  Prosecutorial Misconduct

Petitioner claims that the prosecutor committed misconduct at trial when he allowed Juarez to testify falsely that "the reason Andrea Mestas was murdered was because she was a 'rat.'"  (Pet. at 5, 10.)  He also claims that the prosecutor improperly failed to produce

/////

---

[6]  Notably, petitioner's counsel testified at the hearing on the motion for new trial that he subpoenaed housing records from DVI and that those records showed that "for a period of about 10 days, give or take . . . Mr. Juarez' cell and Mr. Peraza's cell were separated by one other – one cell, the best I could recall."  (RT at 2549.)

[7]  The trial judge explained this to the jurors at petitioner's trial, informing them that Juarez's testimony on this point was only relevant to demonstrate that Juarez was told and believed that Mestas was a "rat."  (RT at 1029-31.)

1  exculpatory evidence to the defense demonstrating that Mestas was not, in fact, a "rat."  (Id.)  In

2  this regard, petitioner explains that:

3          the prosecutor permitted Robert Juarez to testify that the reason
           Andrea Mestas was murdered was because she was a "rat,"
4          meaning that she had provided information against a gang member
           relative to a 1997 murder.  However, the prosecutor worked on the
5          1997 murder case and knew or should have known that Mestas had
           not provided information in that case.

6

7  (Id. at 10.)  Petitioner contends that the prosecutor "should have but did not provide the defense

8  with police reports, investigative reports of the district attorney or court transcripts to show that

9  Mestas was not a 'rat.'"  (Id.)  Conversely, petitioner argues that the prosecutor should have

10 provided evidence corroborating that Mestas had testified for the prosecution in a criminal case,

11 to substantiate his theory that Mestas was killed because she was a "rat."  (Traverse at 10-11.)

12 Petitioner argues, "the fact that the prosecution did not present any evidence of the kind supports

13 petitioner's contention that Juarez was lying."  (Id. at 11.)

14          A defendant's due process rights are violated when a prosecutor's misconduct

15 renders a trial fundamentally unfair.  Darden v. Wainwright, 477 U.S. 168, 181 (1986).

16 However, such misconduct does not, per se, violate a petitioner's constitutional rights.  Jeffries v.

17 Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing Darden, 477 U.S. at 181 and Campbell v.

18 Kincheloe, 829 F.2d 1453, 1457 (9th Cir. 1987)).  Rather, claims of prosecutorial misconduct are

19 reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's

20 [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due

21 process.'"  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).  See also Greer v. Miller, 483

22 U.S. 756, 765 (1987); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Turner v Calderon,

23 281 F.3d 851, 868 (9th Cir. 2002).  Relief is limited to cases in which the petitioner can establish

24 that prosecutorial misconduct resulted in actual prejudice.  Johnson, 63 F.3d at 930 (citing Brecht

25 v. Abrahamson, 507 U.S. 619, 637-38 (1993)); see also Darden, 477 U.S. at 181-83; Turner, 281

26 F.3d at 868.  Put another way, prosecutorial misconduct violates due process when it has a

1  substantial and injurious effect or influence in determining the jury's verdict.  See Ortiz-

2  Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

3          The United States Supreme Court has held "that the suppression by the

4  prosecution of evidence favorable to an accused upon request violates due process where the

5  evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

6  the prosecution."  Brady v. Maryland, 373 U.S. 83, 87 (1963).  See also Bailey v. Rae, 339 F.3d

7  1107, 1113 (9th Cir. 2003).  The duty to disclose such evidence is applicable even though there

8  has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and

9  encompasses impeachment evidence as well as exculpatory evidence.  United States v. Bagley,

10  473 U.S. 667, 676 (1985).  A Brady violation may also occur when the government fails to turn

11  over evidence that is "known only to police investigators and not to the prosecutor."

12  Youngblood v. West Virginia, 547 U.S. 867, 870 (2006) (quoting Kyles v. Whitley, 514 U.S.

13  419, 438 (1995)).[8]  There are three components of a Brady violation:  "[t]he evidence at issue

14  must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the

15  evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

16  must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  See also Banks v. Dretke,

17  540 U.S. 668, 691 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005).

18          In order to establish prejudice, a petitioner must demonstrate that "'there is a

19  reasonable probability' that the result of the trial would have been different if the suppressed

20  documents had been disclosed to the defense."  Strickler, 527 U.S. at 289.  "The question is not

21  whether petitioner would more likely than not have received a different verdict with the

22  evidence, but whether "in its absence he received a fair trial, understood as a trial resulting in a

23  verdict worthy of confidence."  (Id.) (quoting Kyles, 514 U.S. at 434).  See also Silva, 416 F.3d

24

25          [8]  "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the
26  others acting on the government's behalf in the case, including the police."  Kyles, 514 U.S. at
    437.

1   at 986 ("a Brady violation is established where there 'the favorable evidence could reasonably be

2   taken to put the whole case in such a different light as to undermine confidence in the verdict.'")

3   Once the materiality of the suppressed evidence is established, no further harmless error analysis

4   is required. Kyles, 514 U.S. at 435-36; Silva, 416 F.3d at 986. "When the government has

5   suppressed material evidence favorable to the defendant, the conviction must be set aside."

6   Silva, 416 F.3d at 986.

7          It is also clearly established that "a conviction obtained by the knowing use of

8   perjured testimony must be set aside if there is any reasonable likelihood that the false testimony

9   could have affected the jury's verdict." Bagley, 473 U.S. at 680 n.9. See also Hayes v. Brown,

10  399 F.3d 972, 978 (9th Cir. 2005) ("One of the bedrock principles of our democracy, 'implicit in

11  any concept of ordered liberty,' is that the State may not use false evidence to obtain a criminal

12  conviction" (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)); Morales v. Woodford, 388

13  F.3d 1159, 1179 (9th Cir. 2004) ("The due process requirement voids a conviction where the

14  false evidence is 'known to be such by representatives of the State.'") (quoting Napue, 360 U.S.

15  at 269). This rule applies even where the false testimony goes only to the credibility of the

16  witness. Napue, 360 U.S. at 269; Mancuso v Olivarez, 292 F. 3d 939, 957 (9th Cir. 2002).

17  There are two components to establishing a claim for relief based on the prosecutor's

18  introduction of perjured testimony at trial. First, the petitioner must establish that the testimony

19  was false. United States v. Polizzi, 801 F.2d 1543, 1549-50 (9th Cir. 1986). Second, the

20  petitioner must demonstrate that the prosecution knowingly used the perjured testimony. Id.

21  Mere speculation regarding these factors is insufficient to meet petitioner's burden. United

22  States v. Aichele, 941 F.2d 761, 766 (9th Cir. 1991).

23          Petitioner has failed to demonstrate that the prosecutor committed misconduct or

24  that he failed to turn over Brady material in connection with the testimony of prosecution witness

25  Juarez. There is no evidence before this court that Juarez's testimony that he had heard Mestas

26  was a "rat" was false or that the prosecutor knew it to be false. There is also no evidence that the

1  prosecutor suppressed evidence favorable to petitioner.  Petitioner's bare, unsupported claim that

2  the prosecutor could have proven Mestas did not testify in a 1997 murder trial is insufficient to

3  demonstrate prejudice. Accordingly, petitioner is not entitled to relief on this claim.

4         D.  Sufficiency of the Evidence

5         Petitioner claims that the evidence introduced at his trial was insufficient to

6  support his conviction on the charge of participation in a criminal street gang, pursuant to

7  California Penal Code § 186.22.  (Pet. at 5, 12.)  Specifically, he contends that while § 186.22

8  requires proof that the street gang committed at least two predicate crimes, the prosecution

9  presented evidence of only one such crime during its case-in-chief.  (Id.)[9]

10        The California Court of Appeal explained the background to this claim and its

11 ruling thereon as follows:

12        Defendants argue there is insufficient evidence to support their
          convictions for participating in a criminal street gang in violation
13        of section 186.22, subdivision (a), which requires that they actively
          participated in a street gang with knowledge that its members
14        engaged in a pattern of criminal activity.  "Pattern of criminal
          activity" is defined in subdivision (e) of section 186.22 as the
15        commission of, solicitation of, or conviction of two or more
          specified predicate offenses.

16
          Defendants assert that, during the evidentiary phase of the trial, the
17        prosecutor neglected to introduce evidence of the second predicate
          offense, a murder committed on February 2, 1997.  Instead,
18        defendants stipulated to this predicate crime after the prosecution
          and the defense had rested.  Defendants note that, rather than
19        presenting this stipulation to the jury before the prosecutor began
          his closing argument, the court waited until it gave its instructions
20        to advise the jury that defendants had "stipulated to the existence
          of one such pattern crime."

21
          Defendants' contention is twofold:  (1) the court erred in failing to
22        enter a judgment of acquittal on its own motion when the
          prosecution failed to present the requisite evidence before closing
23        its case-in-chief (§ 1118.1); and (2) there is insufficient evidence to
          support the verdict because the stipulation regarding the predicate

24

25        [9]  Respondent suggests that petitioner did not exhaust his federal due process claim in
   state court.  (Answer at 34-35.)  However, even assuming the claim is unexhausted, this court
26 will recommend that relief be denied on the merits pursuant to 28 U.S.C. § 2254(b)(2).

                                        25

offense was never presented to the jury during the evidentiary phase of trial.  The contention fails for two reasons.

First, the presentation of defense evidence without moving for acquittal waived any claim that the evidence was insufficient at the close of the prosecution's case.  (People v. Smith (1998) 64 Cal.App.4th 1458, 1468.)

Second, defendants overlook that the record indicates the parties and court were all aware a stipulation would be forthcoming after the close of evidence.  As stated by the prosecutor, "except for [a] couple of stipulations that we'll get to, I believe later, the People would rest."  Thereafter, certain stipulations were placed on the record before the defense rested, and the court noted the parties would deal with the stipulation regarding the predicate offense later, thereby indicating that it was aware of the nature of the forthcoming stipulation.  The parties subsequently discussed an agreement that appears to have been reached earlier between the prosecutor and both defense counsel concerning a stipulation regarding one of the predicate offenses.

The court explained to defendants that their attorneys did not want the prosecutor to put on evidence that certain members of their gang had committed a murder.  Thus, counsel had agreed to stipulate that the predicate offense had occurred and, in exchange, the jury would not be told the details of the crime; instead, it simply would be instructed that the parties had stipulated to the existence of one of the predicate crimes.  Defendants were informed that, if they did not agree to this stipulation, the prosecutor would be permitted to reopen and put on evidence proving the crime had occurred.  Both defendants agreed to the stipulation, and the court subsequently instructed the jury in accordance with the stipulation.

Under the circumstances, there was no basis for the court to enter a judgment of acquittal on its own motion simply because the prosecutor did not introduce the stipulation during its case-in-chief. Rather, it appears that counsel had agreed not to have such evidence introduced by the prosecutor unless defendants would not agree to the stipulation.

Moreover, as the People point out, ample evidence of other qualifying predicate offenses was introduced in the prosecutor's case-in-chief, in addition to the charged crimes, all of which could be used to prove a pattern of criminal activity.  (People v. Gardeley (1996) 14 Cal.4th 605, 625.)  This evidence, which defendants do not attempt to refute, precluded a judgment of acquittal.  Contrary to defendants' intimation otherwise, the court was not limited to considering the sufficiency of the evidence regarding the stipulated predicate offense in determining whether the prosecution had presented sufficient evidence to withstand a motion for acquittal at

1   the close of its case-in-chief.  (<u>People v. Mendoza</u> (2000) 24

2   Cal.4th 130, 175 [a trial court should deny a motion for acquittal when there is any substantial evidence of the existence of each

3   element of the crime charged].)

4   Also unpersuasive is defendants' claim that reversal is mandated because the jury was not advised of the stipulation during the

5   evidentiary portion of the trial.  They rely on <u>U.S. v. James</u> (9th Cir. 1993) 987 F.2d 648, but in that case the nature of the

6   stipulation was not clear from the record, and the court did not instruct the jury regarding the terms of the stipulation.  (<u>Id.</u> at pp.

7   649-651.)  Here, the parties agreed the jury simply would be instructed that defendants had stipulated to the existence of one of

8   the predicate crimes and that the details of the crime would be withheld from the jury.  Defendants received the benefit of their

9   bargain when the court instructed the jury in accordance with their agreement, and the prosecution did not disclose the nature of the

10  stipulated predicate offense.

11  Under the circumstances, defendants have no basis to contest the prosecutor's failure to advise the jury of the stipulation or read it to

12  them during the evidentiary portion of the trial.  (<u>United States v. Hardin</u> (11th Cir 1998) 139 F.3d 813, 816-817; <u>U.S. v. Branch</u> (5th

13  Cir. 1995) 46 F.3d 440, 442.)  Defendants' stipulation waived the prosecution's burden to introduce evidence of the stipulation and

14  foreclosed a challenge to the sufficiency of the evidence.  (<u>U.S. v. Harrison</u> (D.C. Cir. 2000) 204 F.3d 236, 242 ["[N]othing in either

15  law or logic compels us to reverse a conviction when the defendant enters into a stipulation on an element and then seeks a windfall

16  from the government's failure to formally read the stipulation to the jury"].)

17  (Opinion at 42-45.)

18        The Due Process Clause of the Fourteenth Amendment "protects the accused

19  against conviction except upon proof beyond a reasonable doubt of every fact necessary to

20  constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  There

21  is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

22  favorable to the prosecution, any rational trier of fact could have found the essential elements of

23  the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  "[T]he

24  dispositive question under <u>Jackson</u> is 'whether the record evidence could reasonably support a

25  finding of guilt beyond a reasonable doubt.'" <u>Chein v. Shumsky</u>, 373 F.3d 978, 982 (9th Cir.

26  2004) (quoting <u>Jackson</u>, 443 U.S. at 318).  "A petitioner for a federal writ of habeas corpus faces

1    a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction

2    on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In

3    order to grant the writ, the federal habeas court must find that the decision of the state court

4    reflected an objectively unreasonable application of Jackson and Winship to the facts of the case.

5    Id. at 1275 & n.13.

6            After a review of the record, the court concludes that there was sufficient evidence

7    presented to the jury that the street gang with which petitioner was involved had committed at

8    least two predicate criminal offenses, as required by the California Penal Code § 186.22.  As

9    explained by the California Court of Appeal, petitioner stipulated to the existence of one

10   predicate offense and the jury was so instructed.  (See RT at 2353.)  All of the parties were aware

11   that this procedure would be followed.  Under these circumstances, petitioner is not entitled to

12   relief on his claim that the stipulated evidence was not properly before the jury.  See United

13   States v. Harrison, 204 F.3d 236, 242-243 (D.C. Cir. 2000) ("we hold that when Harrison entered

14   into the stipulations that the interstate commerce and prior conviction elements of the § 922(g)

15   charge were present, he waived his right to challenge the sufficiency of the evidence on those

16   elements, even though the government failed to introduce any evidence on those elements");

17   United States v. Hardin, 139 F.3d 813, 816-17 (11th Cir. 1998) (where the defendant stipulated

18   to a prior conviction but the stipulation was never read to the jury, "[the defendant] waived his

19   right to have the government produce evidence of his felon status, including the stipulation

20   itself" and thus had "no legal or equitable basis to contest the government's mistake"); United

21   States v. Branch, 46 F.3d 440, 442 (5th Cir. 1995) ("Once a stipulation is entered, even in a

22   criminal case, the government is relieved of its burden to prove the fact which has been stipulated

23   by the parties.  Appellant . . . cannot now claim that the government failed to offer evidence on

24   an element to which he confessed").  Cf. United States v. James, 987 F.2d 648 (9th Cir. 1993)

25   (conviction reversed because of a complete failure to introduce evidence on a stipulated element

26   /////

28

of the crime, where the stipulation was ambiguous and, in any event, was never mentioned to the jury nor placed in the record).

Here, even if the trial court's instruction to the jury did not constitute sufficient evidence to support the existence of a predicate offense, petitioner does not contest the state appellate court's finding that "ample evidence of other qualifying predicate offenses was introduced in the prosecutor's case-in-chief." (Opinion at 44.) Accordingly, from the evidence introduced at trial, the jury could properly find that at least two predicate offenses had been committed by the street gang with which petitioner was associated.

The state court opinion rejecting petitioner's claim of insufficient evidence is based on a reasonable construction of the evidence in this case and is not contrary to or an objectively unreasonable application of federal law. See Woodford v. Visciotti, 537 U.S. 19, 25 (2002); see also 28 U.S.C. § 2254(d)(1). Accordingly, petitioner is not entitled to habeas relief on this claim.

### E. Jury Instruction Error

Petitioner raises several claims of jury instruction error. After setting forth the applicable legal principles, the court will evaluate these claims below.

A challenge to jury instructions does not generally state a federal constitutional claim. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); See also Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) The analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is similar to the analysis used in determining, under Brecht v. Abrahamson, 507 U.S.

619, 623 (1993), whether an error had "a substantial and injurious effect" on the outcome.  See

Sarausad v. Porter, 479 F.3d 671, 692 (9th Cir. 2007); Thomas v. Hubbard, 273 F.3d 1164, 1179

(9th Cir. 2001), overruled on other grounds by Payton v. Woodford, 299 F.3d 815, 828 n.11 (9th

Cir. 2002).

              1.  Failure to Instruct on Target Offense (Ground Five)

              Petitioner's jurors were instructed with CALJIC No. 3.02, which provides, in

relevant part:

> A co-principal, or one who aids and abets another, in the
> commission of a crime or crimes is not only guilty of the crimes
> aided and abetted, but is also guilty of any other crime committed
> by a principal which is a natural and probable consequence of the
> crime or crimes originally aided and abetted.
>
> In order to find a defendant guilty of a crime under this rule of law,
> you must be satisfied beyond a reasonable doubt that:
>
> 1.  A particular crime, referred to as the target crime, was
> committed;
>
> 2.  That a defendant aided and abetted the target crime;
>
> 3.  That a co-principal in the target crime committed another crime;
> and
>
> 4.  The other crime was a natural and probable consequence of the
> commission of the target crime.

(CT at 825.60.)  The jury did not receive a jury instruction identifying possible "target crimes" as

referred to in CALJIC No. 3.02.

              Petitioner claims that the trial court violated his right to due process when it failed

to instruct the jury on the "target crime."  (Pet. at 13-14.)  He argues that the trial court's failure

to give such an instruction created a risk that the jury would find him guilty of certain offenses

based on "unguided speculation as to what the target offense might have been."  (Traverse at 15.)

Petitioner also argues that "proof of the target offense is a factual element which exposes

petitioner to significant punishment and must be proved to the jury beyond a reasonable doubt

/////

1  under the principle enunciated in [In re] Winship, [397 U.S. 358 (1970)] and Apprendi v New

2  Jersey, 530 U.S. 466, 490 (2000)." (Id. at 14.)

3         The California Court of Appeal explained the background to this jury instruction

4  claim and its resolution thereof, as follows:

> The trial court instructed the jury that it could find defendant
> Peraza guilty of the two murders, burglary, attempted murder,
> shooting at an inhabited dwelling, and street terrorism offenses
> (counts I - VI) if it found that he aided and abetted the commission
> of another offense (i.e., a target crime) and the charged crimes were
> "a natural and probable consequence of the commission of the
> target crime." (CALJIC No. 3.02.) However, the court failed to
> specify any target crimes for the jury.
>
> Peraza points out it is error for the trial court to neglect to instruct
> on a target offense because this gives rise to a "risk that the jury
> will 'indulge in unguided speculation' [citation] in making the
> requisite factual findings." (People v. Prettyman (1996) 14 Cal.4th
> 248, 272.) Reversal is required if the record discloses there is a
> reasonable likelihood that the instruction led the jury to misapply
> the doctrine of natural and probable consequences. (Id. at pp. 272-
> 273.) Two important factors in our prejudicial error analysis are
> whether the natural and probable consequences theory was argued
> to the jury, and whether there was evidence presented of any other
> target crimes. (Ibid.)
>
> Peraza concedes that no one argued a natural and probable
> consequences theory to the jury. Nevertheless, he believes the
> court's error was prejudicial because the prosecution presented
> evidence of other crimes against him, namely the charged offenses
> of possession of a firearm by a convicted felon, the assault upon
> Davis with a deadly weapon, and the false imprisonment of Davis
> by force or violence (counts VIII - X.) We are not persuaded.
>
> Peraza fails to provide any meaningful analysis demonstrating how
> the jury could find that counts I through VI were natural and
> probable consequences of the commission of counts VIII through
> X, which occurred *after* the commission of counts I through VI.
> He simply asserts it is possible. This is not sufficient to establish
> that he suffered any prejudice from the trial court's instructional
> error. (Cf. People v. Waidla (2000) 22 Cal.4th 690, 737 [rejecting
> a similar claim raised in a perfunctory fashion]; People v. Hardy
> (1992) 2 Cal.4th 86, 150 [a reviewing court need not address
> appellate contentions mentioned briefly without supporting
> argument]; People v. Coley (1997) 52 Cal.App.4th 964, 972
> [appellant bears the burden of showing error and resulting
> prejudice else his argument is waived].)

/////

31

1   In his reply brief, Peraza baldly asserts there was evidence of other
    crimes, aside from the charged offenses, which could have been
2   viewed as target offenses by the jury.  Again, he fails to provide
    any meaningful analysis explaining how a reasonable jury could
3   find the crimes charged in counts I through VI were a natural and
    probable consequence of those offenses.  Moreover, he fails to cite
4   to any evidence demonstrating that he aided and abetted those
    other crimes, which is a prerequisite to the jury using them as
5   target offenses under the instructions given by the court.  Hence,
    this contention requires no further discussion.  (People v. Waidla,
6   supra, 22 Cal.4th at p. 737; People v. Hardy, supra, 2 Cal.4th at p.
    150; People v. Coley, supra, 52 Cal.App.4th at p. 972.)

7

8   (Opinion at 45-47.)

9          Petitioner has failed to demonstrate that the trial court's error in failing to instruct

10  the jury on the "target crime" rendered his trial fundamentally unfair.  As was the case in state

11  court, petitioner's briefing in this habeas proceeding fails to explain how he was prejudiced by

12  this instructional error, in light of the fact that: (1) counts I through VI could not have been the

13  "natural and probable consequence" of crimes which occurred later in time; and (2) there was no

14  evidence that petitioner "aided and abetted another" in the commission of crimes (against Davis)

15  which he was charged to have committed alone.  Petitioner simply fails to explain the nature of

16  any alleged prejudice under these circumstances.  See Jones, 66 F.3d at 204; James, 24 F.3d at

17  26.  See also Henderson v. Kibbe, 431 U.S. 145, 154 (1977) ("It is the rare case in which an

18  improper instruction will justify reversal of a criminal conviction when no objection has been

19  made in the trial court").  The state appellate court's decision that petitioner failed to establish

20  prejudice with respect to this claim is not contrary to or an unreasonable application of federal

21  law.  Accordingly, petitioner is not entitled to habeas relief with respect to this claim.

22         Petitioner's claim based on the decisions in Winship and Apprendi is also

23  unavailing.  Petitioner has not cited any federal case holding that failure to instruct on the target

24  offense under these circumstances constitutes a due process violation by allowing the jury to

25  convict on proof less than beyond a reasonable doubt.  Consequently, because there is no clearly

26  established federal law which "squarely addresses" this issue, the state court did not

unreasonably apply federal law in concluding that petitioner was not entitled to relief with respect to these claims.  See Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009); Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

### 2.  CALJIC No. 17.41.1 (Ground Six)

CALJIC No. 17.41.1, as given to petitioner's jury, provides:

> The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on [penalty or punishment, or] any [other] improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation.

(CT at 825.116.)[10]  Petitioner claims that the trial court erred in giving CALJIC No. 17.41.1 because it "improperly stifles the open and free deliberations at the core of the jury trial guarantee," "chills, speech and free discourse in the very forum where free and uninhibited discourse is most needed," "suggests to jurors that their words might be used against them," and "affirmatively interferes with the unqualified right of the jury to nullify an unjust law."  (Pet. at 15-16.  See also Traverse at 15-16.)

The California Court of Appeal rejected this argument on appeal, reasoning as follows:

> Defendant Peraza contends the trial court violated his state and federal constitutional rights by instructing the jury with CALJIC No. 17.41.1, which he refers to as the "juror snitch instruction." He concedes that a similar claim was rejected by the California Supreme Court in People v. Engelman (2002) 28 Cal.4th 436, and that we are bound by this decision.  (Auto Equity Sales, Inc. v. Superior Court, supra, 57 Cal.2d at p. 455.)

/////

---

[10]  In People v. Engelman, 28 Cal. 4th 436, 439-40 (2002), the California Supreme Court held that CALJIC 17.41.1 did not infringe upon a defendant's federal or state constitutional right to trial by jury or his state constitutional right to a unanimous jury verdict.  However, exercising its supervisory authority over the lower state courts, the California Supreme Court directed that CALJIC No. 17.41.1 no longer be given in future trials because of its "potential" to intrude on jury deliberations. Id. at 449.

1      Peraza submits the issue solely for purposes of preserving the
      matter for any subsequent federal review.  Accordingly, the
2      contention requires no further discussion.

3 (Opinion at 47-48.)

4     Petitioner's collateral challenge to CALJIC No. 17.41.1 is foreclosed by the

5 decision of the Ninth Circuit Court of Appeals in Brewer v. Hall, 378 F.3d 952, 955-57 (9th Cir.

6 2004).  In Brewer, the Ninth Circuit held that, regardless of the "constitutional merits" of

7 CALJIC No. 17.41.1, habeas corpus relief was unavailable on a challenge to that jury instruction

8 because there is "no Supreme Court precedent clearly establishing" that use of this jury

9 instruction violates a defendant's constitutional rights.  Id. at 955-56.  Here, as in Brewer,

10 petitioner "has pointed to no Supreme Court precedent clearly establishing that CALJIC 17.41.1

11 – either on its face or as applied to the facts of his case – violated his constitutional rights."  Id. at

12 957.  Thus, the state appellate court's rejection of petitioner's jury instruction claim was not

13 contrary to or an unreasonable application of clearly established federal law.  28 U.S.C. §

14 2254(d).

15     Moreover, even if the state trial court erred in instructing the jury with CALJIC

16 No. 17.41.1, the error was harmless under the circumstances of this case.  See Brecht, 507 U.S. at

17 623 (holding that a federal court may not grant habeas relief for trial errors without a showing of

18 actual prejudice, defined as a "substantial and injurious effect or influence in determining the

19 jury's verdict").  There is no evidence in this case that the giving of CALJIC No. 17.41.1 chilled

20 the jurors' exercise of free speech, prevented free and full deliberations, or allowed for

21 petitioner's conviction on proof less than beyond a reasonable doubt.  Accordingly, petitioner is

22 not entitled to relief on this claim.

23      3.  Jury Instruction on Intent to Kill (Ground Seven)

24     Petitioner was charged with the special circumstance of multiple murder,

25 pursuant to California Penal Code § 190.2(a)(3).  (CT at 641.)  Petitioner argues that the trial

26 court gave an incorrect version of the jury instruction regarding the multiple murder special

circumstance.  Specifically, he contends that one of the jury instructions improperly advised the

jurors that they could find the special circumstance to be true if they concluded that petitioner

aided and abetted a murder with reckless indifference to human life, rather than requiring them to

find that petitioner aided and abetted the actual killer with the intent to kill, as required by

California Penal Code § 190.2(c).  (Pet. at 17-18.)  On direct appeal, the California Court of

Appeal concluded that petitioner's jury  was correctly instructed on the applicable law.  The court

explained its reasoning as follows:

> The reporter's transcript discloses the trial court correctly
> instructed the jury in language of CALJIC No. 8.80.1 in pertinent
> part as follows:  "If you find that a defendant was not the actual
> killer of a human being or if you are unable to decide whether
> defendant was the actual killer or an aider and abettor, you cannot
> find the special circumstance to be true as to that defendant unless
> you are satisfied beyond a reasonable doubt that such defendant
> with the intent to kill aided and abetted or assisted any actor in the
> commission of the murder in the first degree."
>
> However, the clerk's transcript contains two written versions of
> CALJIC No. 8.80.1, only one of which comports with the version
> given orally to the jury.  The other written version is identical to
> the instruction given by the court except it adds the incomplete
> phrase "or with reckless indifference to human life and as a major
> participant aided and abetted" immediately after the above-quoted
> portion of CALJIC No. 8.80.1.
>
> Defendant Peraza contends the latter instruction is erroneous
> because it advised the jurors that they could find the special
> circumstance to be true if they found Peraza aided and abetted a
> murder with reckless indifference to human life, rather than
> requiring them to find that he aided and abetted the actual killer
> with the intent to kill, as required by [California Penal Code]
> section 190.2, subdivision (c).[11]  He argues that since the incorrect
> instruction is part of the certified clerk's transcript under the
> heading "Instructions Given," and because we must presume
> official duty was correctly performed (Evid. Code, § 664), we must
> presume the clerk's transcript correctly reflects that the jury was
> given the incorrect written version of the instruction in addition to
> the correct version.  We disagree.

---

[11]  Section 190.2, subdivision (c) states in pertinent part:  "Every person, not the actual
killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or
assists any actor in the commission of murder in the first degree shall be punished by death or
imprisonment in the state prison for life without the possibility of parole . . . ."

Because they include numerous interlineations and reflect who requested them, the written instructions in the clerk's transcript appear to be rough drafts rather than final, sanitized instructions eventually given to the jury.  It is readily apparent that the correct written version of CALJIC No. 8.80.1 is a photocopy of the incorrect version, with the only difference being an interlineation deleting the language about which Peraza complains.  This indicates that the court discovered the error prior to instructing the jury.  Under the circumstances, we presume official duty was correctly performed and the court gave the jury only the correct written instruction, which comported with the court's oral instructions.

This presumption is supported both by the fact that the court read CALJIC No. 8.80.01 to the jury only once rather than twice, as would be expected if there were two final copies of the written instructions, and by the fact that the jury did not question the court about which instruction applied, as it presumably would have done if there was a conflict in the written instructions.

Peraza has failed to establish that any instructional error occurred.  (People v. Clifton (1969) 270 Cal.App.2d 860, 862 [error is never presumed, and it is the appellant's burden to present a record showing it; any uncertainty in the record in that respect will be resolved against him].)

(Opinion at 48-50.)

Petitioner argues, in essence, that the improper instruction on the multiple murder special circumstance, which is contained in the Clerk's Transcript on Appeal (see CT at 825.80 - 825.83) must have been included in the packet of instructions received by the jury, and that the jury may have relied on that improper instruction in reaching a verdict on the special circumstance allegation.  (Pet. at 17-18.)  As set forth above, after consideration of the entire relevant record the California Court of Appeal found that the jury was given only the correct jury instruction on the multiple murder special circumstance.

This court presumes that the state court's findings of fact are correct unless petitioner rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).  "Clear and convincing evidence" within the meaning of § 2254(e) "requires greater proof than preponderance of the evidence" and must produce "an abiding conviction" that the factual contentions being advanced by the petitioner are

1  "highly probable."  <u>Cooper v. Brown</u>, 510 F.3d 870, 919 (9th Cir. 2007) (quoting <u>Sophanthavong</u>

2  <u>v. Palmateer</u>, 378 F.3d 859, 866 (9th Cir. 2004)).  "Where the record is ambiguous, a state

3  appellate court's factual findings are deemed to be 'fairly supported by the record' within the

4  meaning of (former) section 2254(d)(8)."  <u>Palmer v. Estelle</u>, 985 F.2d 456, 458 (9th Cir. 1993)

5  (concluding that where the record was ambiguous the findings of the state appellate court must

6  be upheld) (quoting <u>Wainwright v. Goode</u>, 464 U.S. 78, 85 (1983)).  <u>See</u> <u>also</u> <u>Neuschafer v.</u>

7  <u>McKay</u>, 807 F.2d 839, 841 (9th Cir. 1987) (observing that courts of appeals "are instructed to

8  give the benefit of the doubt to a state appellate court's reading of a record on appeal just as we

9  would to a state trial court's findings of fact").

10         Petitioner has not overcome the presumption of correctness with respect to the

11  state court's finding that the jury in his case received only the correct written instruction

12  regarding the multiple murder special circumstance.  To support its finding in this regard, the

13  state court relied on a comparison of the two jury instructions and the reporter's transcript, which

14  reflected that only one instruction on the special circumstance was read to the jury in open court.

15  (<u>See</u> RT at 2338.)  Petitioner, on the other hand, relies on mere speculation that the jury received

16  both of the instructions, citing only a general presumption that "official duty has been regularly

17  performed."  (Pet. at 17.)  Petitioner's arguments do not constitute "clear and convincing

18  evidence," and do not produce an "abiding conviction" that his version of the events is "highly

19  probable."  This court must therefore rely on the state court's factual conclusion.

20         Because petitioner's jury received the correct jury instruction regarding the

21  multiple murder special circumstance, petitioner is not entitled to relief on this due process

22  claim.

23       F.  <u>Shackling (Ground Eight)</u>

24         Petitioner claims that his right to due process was violated by the use of leg

25  restraints on him during trial.  (Pet. at 19.)  He argues that the trial court improperly failed to

26  /////

1    make a determination that shackles were justified by safety or flight concerns.  (Id.; Traverse at

2    18.)

3                    The California Court of Appeal rejected these arguments, reasoning as follows:

4            Defendant Peraza's last contention is that the trial court violated
             his state and federal constitutional rights to counsel and due
5            process by restraining him in a leg brace without a showing of need
             and without considering less restrictive alternatives.

6
             Generally, there must be a manifest need for physical restraints,
7            which may not be imposed absent a showing of violence, a threat
             of violence, or other nonconforming conduct that would disrupt the
8            judicial process if defendant were not restrained.  (People v.
             Jackson (1996) 13 Cal.4th 1164, 1215; People v. Duran (1976) 16
9            Cal.3d 282, 290-292, fn. 11.)  Shackling is discouraged because it
             may impair a defendant's ability to participate in the defense and
10           may cause prejudice in the minds of the jurors.  (People v. Duran,
             supra, 16 Cal.3d at pp. 290-291; accord, People v. Mar (2002) 28
11           Cal.4th 1201, 1216.)  The trial court's decision to use physical
             restraints is reviewed for abuse of discretion.  (People v. Jackson,
12           supra, 13 Cal.4th at p. 1215.)

13           Prior to trial, defendant Valdez's attorney sought to preclude the
             shackling of his client.  The trial court stated it had not heard a
14           basis for shackling defendants and, unless and until such evidence
             was presented, defendants would not be visibly shackled.
15           However, because defendants had to be brought to court through a
             public hallway, rather than a secure corridor, they would have to
16           wear a non-visible leg brace.  The court described the brace as one
             that fits under a defendant's pants and would allow him to bend his
17           legs, but would lock in a straightened position if he fully extended
             his legs in an attempt to run.  Neither defense counsel voiced any
18           objection to the court's decision.

19           Peraza claims the court abused its discretion because the record is
             devoid of any evidence of violent or disruptive conduct by him.
20           He emphasizes that the court stated there was "no basis to shackle
             the defendants."  He concedes the leg brace was not visible to the
21           jury, but argues it necessarily "materially altered his ability to
             communicate with his counsel and assist in his defense."
22
             The People respond that, because he failed to make such an
23           objection in the trial court, Peraza has waived his claim that the leg
             brace violated his constitutional rights.  (Citing Estelle v. Williams
24           (1976) 425 U.S. 501, 504-505 [48 L.Ed.2d 126, 130-1310]; People
             v. Chacon (1968) 69 Cal.2d 765, 778.)
25
             For the following reason, we need not determine whether the trial
26           court abused its discretion in shackling defendant or whether

                                                38

1     defendant waived his claim of error by failing to object to wearing
      restraints.
2
      "No basis for reversal appears [where] the record contains no hint
3     that physical restraints impaired the fairness of defendant's trial
      and thus caused prejudice."  (People v. Anderson (2001) 25 Cal.4th
4     543, 596 [the California Supreme Court has "consistently held that
      courtroom shackling, even if error, was harmless if there is no
5     evidence that the jury saw the restraints, or that the shackles
      impaired or prejudiced the defendant's right to testify or participate
6     in his defense"]; People v. Majors (1998) 18 Cal.4th 385, 406;
      People v. Tuilaepa (1992) 4 Cal.4th 569, 584; People v. Cox
7     (1991) 53 Cal.3d 618, 652-653.)

8     Such is the case here.  Defendant did not testify at trial, and "there
      is no evidence or claim his restraints influenced him not to do so.
9     Moreover, the court ordered that the only restraining device would
      be a leg brace concealed under defendant's trousers; there is no
10    evidence or claim the jury ever saw the brace.  Hence, we have no
      basis to find that prejudice arose."  (People v. Anderson, supra, 25
11    Cal.4th at p. 596.)

12    Peraza's claim that the leg brace necessarily interfered with his
      right to counsel is not persuasive.  In effect, he asks us to assume
13    his restraints affected his ability to communicate with his attorney
      and assist in his defense.  This is insufficient to establish
14    constitutional error and prejudice.  (People v. Pride (1992) 3
      Cal.4th 195, 233-234.)
15

16    (Opinion at 50-52.)

17          The Sixth and Fourteenth Amendments to the United States Constitution assure a

18    criminal defendant the right to a fair trial.  See Estelle v. Williams, 425 U.S. 501, 503 (1976).

19    Visible shackling of a criminal defendant during trial "undermines the presumption of innocence

20    and the related fairness of the factfinding process" and "'affront[s]' the 'dignity and decorum of

21    judicial proceedings that the judge is seeking to uphold.'"  Deck v. Missouri, 544 U.S. 622,

22    630-31 (2005) (quoting Illinois v. Allen, 397 U.S. 337, 344 (1970)).  See also Larson v.

23    Palmateer, 515 F.3d 1057, 1062 (9th Cir. 2008).   The U.S. Supreme Court has therefore held

24    that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the

25    jury absent a trial court determination, in the exercise of its discretion, that they are justified by a

26    state interest specific to a particular trial."  Deck, 544 U.S. at 629.  To protect this right, criminal

1  defendants have "the right to be free of shackles and handcuffs in the presence of the jury, unless

2  shackling is justified by an essential state interest." Ghent v. Woodford, 279 F.3d 1121, 1132

3  (9th Cir. 2002).  See also Jones v. Meyer, 899 F.2d 883, 884 (9th Cir. 1990); Wilson v.

4  McCarthy, 770 F. 2d 1482, 1484 (9th Cir. 1985).

5        Shackling is not unconstitutionally prejudicial per se.  Illinois v. Allen, 397 U.S.

6  at 343-44; Ducket v. Godinez, 67 F.3d at 748 ("shackling is inherently prejudicial, but it is not

7  per se unconstitutional").  In order for a defendant to prevail on the merits of a claim based upon

8  shackling the court must find that the defendant was physically restrained in the presence of the

9  jury, that the shackling was seen by the jury and that the physical restraint was not justified by

10  state interests.  Ghent v. Woodford, 279 F.3d at 1132.  Even where these circumstances are

11  present, unjustified shackling does not rise to the level of constitutional error unless the

12  defendant makes a showing that he suffered prejudice as a result.  Id. (citing United States v.

13  Olano, 62 F.3d 1180, 1190 (9th Cir 1995) and United States v. Halliburton, 870 F.2d 561-62)).

14  See also Larson, 515 F.3d at 1064 (state trial court's violation of petitioner's due process rights

15  by requiring petitioner to wear security leg brace during trial was harmless).  In a federal habeas

16  corpus proceeding such as this one, if the petitioner establishes prejudice the federal court must

17  determine whether the error had a "substantial and injurious effect" on the jury's verdict.  Id.

18  (quoting Castillo v. Stainer, 983 F.2d 145 (9th Cir. 1992), amended 997 F.2d 669 (9th Cir.

19  1993)).  See also Brecht, 507 U.S. at 623.  A federal habeas court should "determine whether

20  what [the jurors] saw was so inherently prejudicial as to pose an unacceptable threat to

21  defendant's right to a fair trial."  Holbrook, 475 U.S. 560, 572 (1986).  The issue is "not whether

22  in retrospect, the trial court could have handled the matter better, but rather, whether the trial

23  court denied appellant a fair trial under the circumstances."  Stewart v. Corbin, 850 F.2d 492,

24  497 (9th Cir. 1988).  In the Ninth Circuit, "only the most egregious kind of shackling has been

25  found . . . to deny due process.  Castillo, 983 F.2d at 148.

26  /////

1    The decision of the California Court of Appeal that petitioner failed to

2  demonstrate prejudice resulting from the use of the leg brace at his trial is not contrary to or an

3  unreasonable application of federal law and should not be set aside.  There is no evidence that

4  any juror saw the leg brace worn by petitioner under his pant leg.  As described by the state

5  appellate court, the brace was hidden under petitioner's clothes.  See Larson, 515 F.3d 1064

6  ("physical restraints such as a waist chain, leg irons or handcuffs may create a more prejudicial

7  appearance than more unobtrusive forms of restraint").  Further, use of the leg brace in this case

8  was justified by the court's interest in ensuring safe passage by petitioner and his co-defendant to

9  and from the courtroom.  There is also absolutely no evidence that the leg brace prevented

10  petitioner from communicating with his trial counsel.  In short, petitioner has failed to show that

11  use of a leg brace had a "substantial and injurious effect or influence in determining the jury's

12  verdict."  Brecht, 507 U.S. at 623.  Accordingly, petitioner is not entitled to relief on this claim.

13    G.  Evidentiary Hearing

14    In his habeas petition and traverse, petitioner requests an evidentiary hearing on

15  his claims of actual innocence, ineffective assistance of counsel, and prosecutorial misconduct.

16  (Pet. at 9, 10; Traverse at 2.)  In addition, on December 22, 2008, petitioner filed a motion "for

17  leave to conduct discovery, expand the record, and evidentiary hearing."  (Doc. No. 39 at 1.)

18  Therein, he included a request for production of documents and a proposed set of interrogatories.

19  The request for production of documents calls for: (1) "any and all investigative reports"

20  obtained by petitioner's trial counsel; (2) documents relating to inmate mail procedures at Pelican

21  Bay; (3) inmate housing records from DVI "showing where petitioner and Robert Juarez were

22  housed at the time petitioner admitted involvement in the crime;" and (4) documents relating to

23  whether Mestas was "perceived to be a rat.'"  (Doc. No. 39 at 7 of 9.)  Petitioner's proposed

24  interrogatories are directed to his trial counsel and "deputy district attorney."  Therein, petitioner

25  asks his trial counsel whether he investigated and obtained records regarding the mail procedures

26  at Pelican Bay and/or "cell housing records" at DVI.  (Id. at 7& 8 of 9.)  He also asks the "deputy

41

1   district attorney" if he investigated and obtained reports regarding Juarez's statement that Mestas

2   was perceived to be a "rat" by the Nuestra Familia.  (Id. at page 8 of 9.)  Petitioner does not

3   elaborate on his request for an evidentiary hearing in connection with his claim of actual

4   innocence.

5          Pursuant to 28 U.S.C. § 2254(e)(2), an evidentiary hearing is appropriate under

6   the following circumstances:

7          If the applicant has failed to develop the factual basis of a claim in
           State court proceedings, the court shall not hold an evidentiary
8          hearing on the claim unless the applicant shows that-

9                 (A) the claim relies on-

10                (i) a new rule of constitutional law, made retroactive to cases on
                  collateral review by the Supreme Court, that was previously
11                unavailable; or

12                (ii) a factual predicate that could not have been previously
                  discovered through the exercise of due diligence; and
13
                  (B) the facts underlying the claim would be sufficient to establish
14                by clear and convincing evidence that but for constitutional error,
                  no reasonable fact finder would have found the applicant guilty of
15                the underlying offense[.]

16         Under this statutory scheme, a district court presented with a request for an

17  evidentiary hearing must first determine whether a factual basis exists in the record to support a

18  petitioner's claims and, if not, whether an evidentiary hearing "might be appropriate." Baja v.

19  Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999). See also Earp v. Ornoski, 431 F.3d 1158, 1166

20  (9th Cir. 2005); Insyxiengmay v. Morgan, 403 F.3d 657, 669-70 (9th Cir. 2005). A petitioner

21  requesting an evidentiary hearing must also demonstrate that he has a "colorable claim for relief."

22  Earp, 431 F.3d at 1167 (citing Insyxiengmay, 403 F.3d at 670; Stankewitz v. Woodford, 365 F.3d

23  706, 708 (9th Cir. 2004); and Phillips v. Woodford, 267 F.3d 966, 973 (9th Cir. 2001)). To show

24  that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would

25  entitle him to relief." Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation

26  marks and citation omitted).

1    Rule 6 of the Rules Governing Section 2254 Cases in the United States District

2 Courts permits discovery in habeas corpus actions.  A habeas petitioner does not enjoy the

3 presumptive entitlement to discovery of a traditional civil litigant and discovery is available only

4 in the discretion of the court and for good cause shown.  See Rules Governing Section 2254

5 Cases, Rule 6(a) 28 U.S.C. foll. § 2254; Rich v. Calderon, 187 F.3d 1064, 1068 (9th Cir. 1999).

6    With respect to petitioner's claims of ineffective assistance of counsel and

7 prosecutorial misconduct, the court concludes that no additional factual development or

8 supplementation is necessary and that an evidentiary hearing is not appropriate.  The facts alleged

9 by petitioner in support of those claims, even if established at an evidentiary hearing, would not

10 entitle petitioner to habeas relief.  Further, petitioner's proposed interrogatories and request for

11 production of documents concern matters that were exhaustively addressed in state court at the

12 hearing on his motion for new trial.  Petitioner's request to conduct still further discovery into

13 those areas essentially constitutes a fishing expedition.  In addition, petitioner's claim of actual

14 innocence is not supported with evidence demonstrating that petitioner is probably innocent of

15 the crimes for which he was convicted.  Accordingly, neither an evidentiary hearing nor

16 expansion of the record is appropriate with respect to that claim.  Therefore, petitioner's request

17 for an evidentiary hearing and for discovery will be denied.

18                                        CONCLUSION

19    Accordingly, IT IS HEREBY ORDERED that petitioner's December 22, 2008

20 request for discovery and an evidentiary hearing is denied.

21    IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

22 habeas corpus be denied.

23    These findings and recommendations are submitted to the United States District

24 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

25 days after being served with these findings and recommendations, any party may file written

26 objections with the court and serve a copy on all parties.  Such a document should be captioned

1  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

2  shall be served and filed within ten days after service of the objections.  The parties are advised

3  that failure to file objections within the specified time may waive the right to appeal the District

4  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

5  DATED: August 20, 2009.

6

7

8  DALE A. DROZD
   UNITED STATES MAGISTRATE JUDGE

9  DAD:8:
   peraza363.hc

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

44